IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**VINCENT PIERCE,**                          Case No. 1:17 CV 2518

    Plaintiff,

    v.                                   Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                  MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Vincent Pierce ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in September 2014 alleging disability onset dates of October 15, 2006 and December 1, 2007, respectively. (Tr. 177-78, 184-88).[1] His claims were denied initially and upon reconsideration. (Tr. 122-27, 132-43). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 144-45). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 27, 2016. (Tr. 43-62). On November 10, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 22-36).

---

1. Plaintiff later amended his alleged onset date to June 19, 2014. (Tr. 207).

The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on December 3, 2017. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in December 1968, making him 44 years old on his alleged onset date, and 47 years old at the September 2016 hearing. *See* Tr. 47. He alleged disability based on diabetes and depression. (Tr. 63). Plaintiff last worked in 2009 as a factory security guard. (Tr. 48). He lost the job when the security company lost the factory contract. *Id*. Plaintiff testified that he was unable to work due to an inability to concentrate, self-harm behavior, and forgetfulness. (Tr. 49).

Plaintiff lived with his wife and mother-in-law in his mother-in-law's home. (Tr. 48). Though he took medication for depression, Plaintiff sometimes felt "frustrated" and hurt himself. (Tr. 50). This practice consisted of taking a small carpenter's knife and cutting "a line straight down" his chest. *Id*. He harmed himself as recently as six weeks prior to the hearing. *Id*.

Plaintiff also had complications due to diabetes, testifying to three laser surgeries in his right eye due to the condition. (Tr. 51). The eye surgeries repaired blood vessels in his head that burst and caused pain. *Id*. Plaintiff testified his eye issue was "somewhat" under control, but he still needed testing every year. (Tr. 52).

Plaintiff was often forgetful and relied on his wife to help manage his affairs. *Id*. He felt this would make it difficult for him to learn a new job. *Id*. Plaintiff missed "a lot" of appointments with Dr. Caito, sometimes because he forgot about them, and sometimes because the doctor cancelled. (Tr. 53). Plaintiff testified that he would have trouble taking orders from supervisors because he got frustrated easily. (Tr. 54). Plaintiff also got frustrated with his mother-in-law often.

(Tr. 55). On one occasion, Plaintiff stated his mother-in-law started yelling at him "for no reason" and he got upset. *Id*. Plaintiff went outside, grabbed a stick, and scraped it against his forearm, leaving a scar. *Id*.

Plaintiff had one friend that he had not seen recently. (Tr. 54). He and his wife did not go out due to financial constraints. *Id*. They often spent time in the backyard with their dog. *Id*; Tr. 57. Plaintiff did not cook or participate in household chores. (Tr. 57). He cared for his personal needs such as bathing and dressing. *Id*.

Relevant Medical Records

In June 2014, Plaintiff saw Sudhir Oza, M.D., for hypertension, diabetes, hyperlipidemia, obesity, and depression. (Tr. 265). Plaintiff reported feeling depressed because he recently lost his home. *Id*. On examination, Plaintiff had high blood pressure, and Dr. Oza diagnosed uncontrolled hypertension and diabetes. *Id*. In August 2014, Plaintiff reported his depression "got a whole lot worse" but had no suicidal ideations. (Tr. 267). Dr. Oza advised Plaintiff to see a psychiatrist. (Tr. 268).

Plaintiff began mental health therapy with psychologists Deborah Koricke, Ph.D., and Nancy Caito, Ph.D., in November 2014 where he reported symptoms of depression at his initial appointment. (Tr. 321). During a December 2014 visit, Plaintiff reported that he went to a shooting range with his friend. (Tr. 319). He also reported a recent argument with his mother-in-law which left him feeling suicidal, but he used appropriate coping skills and waited for these feelings to pass. *Id*. Later that month, Plaintiff reported stress regarding a recent foreclosure and moving in with his mother-in-law. (Tr. 320). Plaintiff expressed a desire to "feel like [his] old self again" and participate in therapy. *Id*.

Later in December, Plaintiff attended a consultative examination with Alison Flowers, Psy.D. (Tr. 272). Plaintiff reported poor sleep patterns, an "up and down" appetite, and a depressed mood characterized by crying spells, dysphoric mood, loss of interest, irritability, and social withdrawal. (Tr. 273-74). He reported thoughts of suicide with no attempts. (Tr. 274). Dr. Flowers found Plaintiff had an open demeanor, appropriate socials skills, restricted affect, and neutral mood. (Tr. 275). She found Plaintiff was able to understand and carry out instructions during the evaluation. (Tr. 277). Dr. Flowers also explained Plaintiff performed math calculations, computed "serial 3s", and had a good "digit span". *Id*. Plaintiff came to the meeting appropriately dressed, though poorly groomed with long disheveled hair. *Id*. Dr. Flowers diagnosed major depressive disorder. (Tr. 276).

At a February 2015 visit with Dr. Koricke, Plaintiff reported his mood "somewhat improved". (Tr. 328). In March, Plaintiff reported his medications helped and he felt "less angry". (Tr. 312). In April, he noted his wife included him in more activities and he was "feeling good"; a friend was also teaching Plaintiff how to do small repairs. (Tr. 361). At a June 2015 visit, Plaintiff reported increased frustration with his mother-in-law and the stress invoked the desire to self-harm. (Tr. 358).

At a June 2015 visit, Dr. Oza observed Plaintiff had an eight-inch self-inflicted laceration on his left forearm. (Tr. 383). Dr. Oza prescribed Wellbutrin. *Id*.

Plaintiff began group therapy in July 2015. (Tr. 354). At his first session, he presented as anxious and withdrawn but was "not as nervous" by the end of the session. *Id*. In August, Plaintiff presented with a euthymic mood and appropriate affect, describing himself as "happy". (Tr. 353). Plaintiff presented as "depressed and sad" in September because he was experiencing pain with a headache. (Tr. 349). He reported a recent self-harm incident, where he acknowledged he should

have reached out to his wife for help. *Id*. During his group therapy course, Plaintiff often presented with a pleasant or euthymic mood, was attentive, and participated in the session. (Tr. 346, 348, 353). At an October 2015 session, Plaintiff discussed a stressful encounter with his mother-in-law where he used coping skills to resist self-harm. (Tr. 363). He was receptive to feedback from others. *Id*.

At a December 2015 visit with Dr. Caito, Plaintiff presented as depressed, had poor hygiene, and showed her self-inflicted scratches on his torso. (Tr. 433). In January 2016, Plaintiff reported a depressed mood due to continued stress in his marriage but resisted self-harm behavior through coping skills learned in group therapy. (Tr. 432). In February, Plaintiff admitted continued self-harm and again showed Dr. Caito small lacerations on his abdomen. (Tr. 429). In April, Plaintiff was "happier" and "less depressed". (Tr. 425). Plaintiff recently received a cell phone from his mother and played games on it when he felt stressed. *Id*. In June, Plaintiff reported that he was becoming more serious about his self-care (diet and exercise), and had lost seven pounds. (Tr. 421-22).

In July 2016, Plaintiff underwent testing on the Weschler Adult Intelligence Scale – IV with Dr. Koricke and Matthew Liptensky M.A. (a professional counselor). (Tr. 409-11). Testing revealed Plaintiff had a full-scale IQ of 74 (Tr. 410), which fell in the borderline range of intellectual functioning (Tr. 411).

At an August 2016 visit with Dr. Caito, Plaintiff felt "happy". (Tr. 417). He reported that he recently received gifts from his wife. *Id*. He coped with stress through video games. *Id*.

Opinion Evidence

*Treating Physicians*

In April 2015, Drs. Caito and Koricke completed a joint assessment of Plaintiff's mental functioning. (Tr. 330-31). They opined Plaintiff had a "constant"[2] ability to maintain regular attendance and leave home on his own. *Id*. He could occasionally[3]: follow work rules; use judgment; deal with the public; relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being distracted; complete a workday without interruption from symptoms; understand, remember, and carry out simple, complex and detailed job instructions; maintain his appearance; socialize; behave in an emotionally stable manner; and relate predictably in social situations. *Id*. They found Plaintiff could rarely[4]: maintain attention and concentration for extended periods; respond to changes in the work setting; function independently without redirection; work in coordination with or proximity to others without being distracting; deal with work stress; and maintain funds. *Id*. In support of these limitations, the Doctors noted Plaintiff had been in their care for five to six months and had a diagnosis of major depressive disorder. (Tr. 331).

In July 2016, during the Weschler Adult Intelligence Scale testing, Dr. Koricke and Mr. Liptensky opined Plaintiff would have difficulty understanding complex and/or multi-step instructions. (Tr. 411). They opined he would have issues in some areas that require higher levels of understanding and comprehension. *Id*. They found Plaintiff's speed and accuracy in gathering information and carrying out instructions was likely impaired based on his level of cognitive functioning. *Id*.

---

2. The form defines "constant" as an unlimited ability to perform an activity. (Tr. 330).
3. The form defines "occasional" as the ability to perform an activity up to 1/3 of a workday. *Id*.
4. The form defines "rare" as "activity that cannot be performed for any appreciable time." *Id*.

In August 2016, Drs. Caito and Koricke completed a second assessment. (Tr. 412-13). This time, they found Plaintiff could rarely[5] perform nineteen of the twenty-two work-related functions. *Id*. The doctors did not check a box indicating an opinion of Plaintiff's ability to follow work rules. (Tr. 412). They found he could occasionally[6] maintain his appearance, and constantly[7] leave home on his own. (Tr. 413). The doctors based these findings on a diagnosis of major depressive disorder with anxiety disorder, a diminished ability to concentrate, and constant thoughts of death and suicidal ideation. *Id*.

*Examining Physician*

In December 2014, Dr. Flowers opined Plaintiff might have difficulty understanding complex instructions. (Tr. 277). She found Plaintiff was "likely able to perform both simple and multi-step tasks." *Id*. Dr. Flowers found Plaintiff able to interact appropriately in the evaluation setting and noted that he did not report a history of difficulty with supervision or coworkers. *Id*.

*State Agency Reviewing Physicians*

In December 2014, Karla Voyten, Ph.D., a State agency psychologist, reviewed Plaintiff's medical records and provided a mental residual functional capacity assessment. (Tr. 81). She found Plaintiff was moderately restricted in his activities of daily living; had moderate difficulties in his ability to maintain social functioning, and in his ability to maintain concentration, persistence or pace. *Id*. Plaintiff was not significantly limited in his ability to understand and remember short, simple instructions, but was moderately limited in his ability to understand and remember detailed instructions. (Tr. 82-83). Dr. Voyten found Plaintiff was not significantly limited in his ability to

---

5. The form defines "rare" as "activity that cannot be performed for any appreciable time." (Tr. 412).
6. The form defines "occasional" as the ability to perform an activity up to 1/3 of a workday. *Id*.
7. The form defines "constant" as an unlimited ability to perform an activity. *Id*.

maintain attention and concentration for extended periods; perform within a schedule; maintain regular attendance; maintain a routine without special supervision; work in coordination with others; or make simple work-related decisions. (Tr. 83). He was moderately limited in his ability to complete a normal workday without interruptions from psychologically based symptoms; interact with the public; accept criticism from supervisors; or maintain socially appropriate behavior. (Tr. 83-84). Plaintiff was not significantly limited in his ability to respond appropriately to changes in the work setting; be aware of normal hazards; travel; or set realistic goals or expectations. (Tr. 84). Dr. Voyten found Plaintiff "retain[ed] the ability to sustain work in a setting where there is infrequent contact with the general public, coworkers, and supervisors, and where the nature of this contact is only superficial." *Id.*

In June 2015, State agency psychologist Todd Finnerty, Psy.D, concurred with Dr. Voyten's findings (Tr. 99-101), except that he found Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting (Tr. 101).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 59-62. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. (Tr. 60-61). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a kitchen helper, merchandise marker, or food service worker. (Tr. 60).

ALJ Decision

In a written decision dated November 10, 2016, the ALJ found Plaintiff met the insured status requirements for DIB through June 30, 2014 and had not engaged in substantial gainful activity since his amended alleged onset date (June 19, 2014). (Tr. 24). He concluded Plaintiff had

the severe impairment of major depressive disorder but found this impairment (alone or in combination with any other) did not meet or medically equal the severity of a listed impairment. (Tr. 25). The ALJ then set forth Plaintiff's residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple tasks in a static setting; can perform goal-oriented work but cannot work at a production rate pace; and can occasionally interact with supervisors, coworkers, and the public if that interaction is limited to speaking and signaling as it is defined in the Selected Characteristics of Occupations (SCO).

(Tr. 27). The ALJ found Plaintiff was unable to perform past relevant work (Tr. 34); was defined as a "younger individual" on the alleged onset date; and had a high school education (Tr. 35). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id.* Thus, the ALJ found Plaintiff not disabled from June 19, 2014 (the amended alleged onset date), through the date of his decision. (Tr. 36).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

10

meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred when he failed to assign controlling weight to the opinions of Plaintiff's treating mental health professionals, Drs. Koricke and Caito. The Commissioner responds that the ALJ's decision is supported by substantial evidence. For the following reasons, the undersigned agrees with the Commissioner, and affirms the decision.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[8] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent

---

8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

11

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, Drs. Koricke and Caito proffered three separate opinions, and Plaintiff argues the ALJ erred in his findings regarding all three. The three opinions are: (1) the April 2015 medical source statement (Tr. 330-31); (2) an opinion regarding the July 2016 Wechsler Adult Intelligence Scale test results (Tr. 409-11); and (3) the August 2016 medical source statement (Tr. 412-13). The ALJ analyzed each opinion separately and gave reasons for the weight he assigned. *See* Tr. 32-34. The undersigned finds the ALJ's decision, regarding all three opinions, supported by substantial evidence.

*April 2015 Opinion*

First Plaintiff argues the ALJ erred in assigning partial weight to the April 2015 medical source statement of Drs. Koricke and Caito. (Doc. 15, at 9). The ALJ addressed the April 2015 opinion and gave reasons for assigning partial weight:

> The undersigned finds that the opinion regarding the claimant's ability to maintain attendance and leave his house is consistent with the record that showed the claimant attended appointments on a regular basis and engaged in activities outside of the home, such as attending lunch with a friend, going to a shooting range, and

> attending church. (Ex. 7F/9, 11F/4, 20, 16F24, 37). The undersigned also finds that the opinion regarding the claimant's ability to occasionally perform functioning in areas of occupational, personal, and social adjustments and intellectual functioning is consistent with the record that showed the claimant had difficulty at times coping with stress and frustration (Hearing Record, 9/27/2016, Ex. 4E, 11F/16, 16F/2, 16, 23, 32). However, the undersigned finds that the opinion regarding the claimant's ability to rarely perform certain functions is inconsistent with the record that showed the claimant experienced stability and improvement in his symptoms, his medications worked well, and his overall treatment plan was effective (Ex. 7F/2, 4-5, 13, 18, 11F/3, 23, 11F/7, 12F/2-3, 16F/8-9, 12-13, 19, 25, 33, 17F/2). Therefore, the undersigned gives partial rather than controlling weight to this MSS.

(Tr. 32-33).

Specifically, Plaintiff argues this analysis is improper because the ALJ impermissibly "played doctor" when he rejected the opinion that Plaintiff could rarely perform certain functions and assumed "stability and improvement in his symptoms" over the opinion of Drs. Koricke and Caito. (Doc. 15, at 13) (citing Tr. 33). Here, as the Commissioner points out, the ALJ did not rely solely on symptom improvement in making his determination. (Doc. 16, at 11-12) (citing Tr. 32-33). Instead, the ALJ addressed whether the limitations opined by Drs. Koricke and Caito were consistent with the record as a whole, ultimately finding that some were – and some were not. *Id.*

Turning first to the supported portion of the opinion, the ALJ found Drs. Koricke and Caito's opinion regarding Plaintiff's ability to maintain regular attendance and leave his home is supported by the record. (Tr. 32). In support, the ALJ cited his regular attendance at appointments, group therapy, and participation in activities outside the home. *Id.* (citing Tr. 361, 438, 450). The ALJ also recognized Plaintiff's difficulty in dealing with stress and frustration. (Tr. 32). He found the doctors' opinion that Plaintiff could occasionally perform functioning in areas of occupational, personal, social adjustments, and intellectual functioning was consistent with Plaintiff's difficulties in these areas. (Tr. 32-33). In support of this finding, the ALJ cited Plaintiff's hearing testimony where he detailed his practice of self-harm (Tr. 50, 55), forgetful nature (Tr. 52-53), and

13

anger towards his mother-in-law (Tr. 55). (Tr. 33). The ALJ further cited treatment notes where Plaintiff detailed continued feelings of depression. (Tr. 429, 432-33). Here, the ALJ properly found this portion the doctors' opinion supported by the record and consistent with their treatment notes. (Tr. 32-33). And, as noted above, an ALJ does not err when he considers these factors in analyzing an opinion. *Rabbers*, 582 F.3d at 660; 20 C.F.R. §§ 404.1527(c); 417.927(c).

In contrast, the ALJ found the doctors' opinion that Plaintiff could only rarely perform in certain areas of functioning inconsistent with the record which showed Plaintiff had stability and improvement in his symptoms through medication and an effective treatment plan. (Tr. 33). As evidence these extreme limitations were inconsistent with Plaintiff's treatment history, the ALJ pointed to improvement in his moods at group therapy (Tr. 346, 348, 353), and a desire to participate in therapy (Tr. 320). He also pointed to Drs. Koricke and Caito's treatment notes where they indicated an appropriate use of coping skills to deal with his stress (Tr. 319-20, 345, 363, 417), and improvement in self-care (Tr. 419-20). The ALJ did not "play doctor" by acknowledging these improvements. A showing of improvement in the record which is inconsistent with a treating physician's opinion is a valid reason for discounting that opinion. *See Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (ALJ "reasonably discounted" an opinion where the "proposed limitations were inconsistent with his own treatment notes from the relevant period" and "also conflicted with [the plaintiff's] daily activities and the majority of other medical evidence in the record"); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (improvement on medication a valid factor in discounting allegations of disabling symptoms). Further, an ALJ also does not "play doctor" where (as here) he complies with the regulations and evaluates the supportability of a treating source's opinion by her own notes, along with the consistency of the opinion with the record as a whole, and assigns controlling weight, or whatever lesser weight the

ALJ chooses to assign the opinion. *Rabbers*, 582 F.3d at 660; 20 C.F.R. §§ 404.1527(c); 417.927(c).

The Court therefore finds the ALJ provided the required "good reasons" when he assigned partial weight to the April 2015 opinion – crediting portions of the opinion which were supported, and rejecting portions of the opinion he found were not. (Tr. 33). Substantial evidence supports his decision.

*Wechsler Adult Intelligence Scale Opinion*

The ALJ next evaluated Dr. Koricke's July 2016 opinion where she interpreted Plaintiff's Wechsler Adult Intelligence Scale test results. Plaintiff also contends the ALJ improperly rejected this opinion. (Doc. 15, at 13-14).

Dr. Koricke and Mr. Liptensky concluded Plaintiff would have difficulty understanding complex and/or multi-step instructions. (Tr. 411). They found he would have issues in some areas that require higher levels of understanding and comprehension. *Id*. Further, they opined Plaintiff's speed and accuracy in gathering information and carrying out instructions was likely impaired based on his level of cognitive functioning. *Id*.

The ALJ evaluated this opinion and provided reasons for the weight assigned:

> The undersigned finds that this opinion is consistent with progress notes that indicated, at times of stress, the claimant showed limited insight and judgment and poor coping skills (Ex. 11F/16, 16F/1-2, 11, 16, 32). However, the undersigned finds that test results are inconsistent with the opinion of the psychological consultative examiner, Dr. Alison Flowers, who estimated the claimant's intellectual functioning to be in the average range based on her sensorium and cognitive functioning evaluation, and the claimant's reports of placement in regular education classes and graduating high school (Ex. 2F/3, 5-6). Therefore, the undersigned gives partial weight to this opinion.

15

(Tr. 33).

Plaintiff argues the ALJ erred in relying on Dr. Flowers opinion because it was issued nearly two years before the Wechsler testing, and Dr. Koricke's opinion is "more reflective of [Plaintiff's] intellectual functioning as it is indicative of the effect of worsening depression on [his] cognitive abilities." (Doc. 15, at 13-14). However, as noted above, the ALJ found the record showed Plaintiff had stability and improvement in his symptoms through medication and an effective treatment plan. (Tr. 33). Some of the ALJ's citations in support came from Dr. Koricke's own treatment notes. *Id*. (citing Tr. 319-20, 345, 363, 417 (appropriate use of coping skills to deal with his stress); Tr. 419-20 (improvement in self-care)). And, as discussed, it is not error for an ALJ to acknowledge a showing of improvement in the record. *Lester*, 596 F. App'x at 389.

Here, the ALJ recognized that Dr. Koricke's interpretation of the Wechsler results was inconsistent with the opinion of the consultative examiner (Dr. Flowers) who, through her own testing, found Plaintiff had average intellectual functioning. (Tr. 33) (citing Tr. 276) ("Intellectual functioning is estimated to be in the average range."). In support of her opinion, Dr. Flowers pointed to Plaintiff's participation in regular education classes and graduation from high school. (Tr. 273). She also found Plaintiff was able to understand and carry out instructions during the evaluation. (Tr. 277). Dr. Flowers also explained Plaintiff could complete simple and multi-step tasks because he could perform math calculations, compute "serial 3s", and had a good "digit span". *Id*. Thus, the ALJ found Dr. Koricke's opinion that Plaintiff would have difficulty with complex or multi-step instructions was inconsistent with Dr. Flower's findings and assigned Dr. Koricke's opinion partial weight as a result. *Id*. And, as stated above, an ALJ may assign less than controlling weight to a treating physician's opinion when it is inconsistent with other evidence in the record. *See Gaskin v Comm'r of Soc. Sec.*, 280 F. App'x 472, 475 (6th Cir. 2008) (an ALJ

properly rejects portions of a treating physician's opinion because they were inconsistent with other evidence in the record); *see also Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 197 (6th Cir. 2004) (same).

In sum, the ALJ's decision to assign partial weight to Dr. Koricke's 2016 Wechsler opinion is supported by substantial evidence.

*August 2016 Opinion*

Finally, the ALJ evaluated the August 2016 medical source statement provided by Drs. Koricke and Caito. The ALJ found:

> Dr. Koricke's opinion suggests worsening of the claimant's symptoms. However, the undersigned finds that the record does not support this level of worsening. In fact, progress notes from individual counseling sessions in 2016 indicated that the claimant experienced improvement, his medications were effective, and he appeared well and was in good spirits (Ex. 7F/2-5, 13, 18, 11F/7, 23, 16F/7-9, 11-15, 25). In addition, progress notes included reports of diminished depression, anger, and self-harm due to using coping skills (Ex. 16F/8-9, 12-14, 18). In fact, progress notes from a June 2016 session indicated that the claimant was motivated to restart physical self-care, eat right, and continue healthy patterns (Ex. 16F/8-9). Further, progress notes from group therapy sessions indicated the claimant was pleasant, cooperative, and generally interacted and participated in the sessions (Ex. 11F/5, 7, 22). Therefore, the undersigned gives little rather than controlling weight to Dr. Koricke's opinion.

(Tr. 33-34).

Here, Plaintiff argues the ALJ "cherry picked" positive records to show his improvements. (Doc. 15, at 15). The problem with a cherry-picking argument is that it runs both ways. Plaintiff argues the ALJ only focused on the positives, where his brief certainly focuses on the negatives. "This argument is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White,* 572 F.3d at 284 ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

17

Here, the ALJ compared the April 2015 assessment with the August 2016 assessment which reflected a strong decrease in Plaintiff's functioning. *Compare* Tr. 330-31, *with* Tr. 412-13. The ALJ found – and the record supports – that "this level of worsening" was inconsistent with Plaintiff's improvement during the same period. (Tr. 33). As evidence, the ALJ cited improvement in Plaintiff's moods and participation in group therapy (Tr. 346, 348, 353), and appropriate use of coping skills to deal with his stressors (Tr. 319-20, 345, 363, 417). The ALJ also cited a June 2016 visit with Dr. Caito where Plaintiff reported improvement in self-care and a desire to continue such healthy patterns. (Tr. 419-20). Here again, the ALJ complied with the regulations and evaluated the consistency of the August 2016 opinion by the doctors' own treatment notes, along with the supportability of the opinion with the record as a whole. *Rabbers*, 582 F.3d at 660; 20 C.F.R. §§ 404.1527(c); 417.927(c). Substantial evidence supports his decision.

Further, as noted above, the ALJ expressly recognized Plaintiff's depression and concentration difficulties, and how they impact certain areas of functioning. *See* Tr. 32-33. This is evidenced further by the RFC, where the ALJ limited Plaintiff to simple tasks at a non-production rate pace with occasional interaction with supervisors and the public. (Tr. 27). An ALJ is only required to include limitations in the RFC that she finds consistent with the record as a whole. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155-56 (6th Cir. 2009). And, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. Here, the undersigned finds the ALJ's decision with respect to all three opinions proffered by Drs. Koricke and Caito supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

                                                s/James R. Knepp II
                                                United States Magistrate Judge